## Stevenson v. Ebervale Coal Company, Appellant.

*Appeals—Reversal for excessive verdict—Act of May 20, 1891, P. L. 101.*

The Supreme Court will only exercise the power conferred upon it by the act of May 20, 1891, to reverse on the ground of excessive verdict, in extreme cases, and not when the verdict merely approaches the verge of excessiveness.

*Evidence—Witness—Experts—Competency of experts.*

The question of the competency or incompetency of expert witnesses is generally a question for the discretion of the trial court. If it appears that the witnesses offered had any claim to the character of experts, the Supreme Court will not reverse on the ground that their experience was not sufficiently special.

*Waters—Pollution of waters—Mines and mining—Evidence.*

In an action to recover damages for pollution of water by mining operations, evidence is not admissible to prove that the plaintiff could procure pure water from another source.

*Waters—Pollution of waters by coal dirt—Damages—Measure of damages—Mines and mining.*

In an action to recover damages for the pollution of a stream by coal dirt, the measure of damages is the cost of removing the coal dirt, unless the cost of the removal of the coal dirt exceeds the value of the entire property. in which case the value of the property is the limit of the measure of damages, and in no event can there be a recovery in excess of the entire property for the permanent injury.

*Damages—Torts to real estate—Compensation for detention.*

In an action to recover damages for injuries to real estate, damages for detention should not be allowed, where it appears that the detention was caused by the grossly excessive and unreasonable demands of the plaintiff.

Argued May 21, 1902.   Appeal, No. 99, Jan. T., 1902, by defendants, from judgment of C. P. Luzerne Co., May T., 1896, No. 657, on verdict for plaintiff in case of Joseph Stevenson v. Ebervale Coal Company et al. Before MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ.   Reversed.

Trespass to recover damages for pollution of a stream by coal dirt.   Before NEWCOMB, J., specially presiding.

See Stevenson v. Ebervale Coal Co., 201 Pa. 112.

When William F. Dodge was on the stand, he was asked this question :

" Q. State whether it is possible or practicable to flush out this mill race, mill dam and reservoir."

Objected to on the ground that it has not been shown that witness is qualified to give an opinion on that subject.

" Q. How long have you been a civil engineer?   A. I have been a civil engineer since about the year 1869 ; first started in my profession.   Q. State whether or not you have had occasion during that time to examine means and methods of flushing out streams that are impregnated or polluted with culm.   A. I have.   Q. How many instances?   A. Most of them made a special examination on that point for the Lehigh Coal and Navigation Company in a case similar to this, in which I was on the opposite side, down the Little Schuylkill river, this state. There was an action there for damage, similar to this.   Q. Did you make a general examination at that time of the practicability—   A. I did.   Q. State the extent of the flushing. A. I did; examined one flushing plant that was successful. Q. Whether or not it is possible or practicable to flush this out? "

PRELIMINARY CROSS-EXAMINATION.

Mr. Palmer: " Q. Did you ever try to get the dirt out of a mill dam? A. I have tried the action of the water upon sediment such as collected in this mill race and mill dam and reservoir; yes. Q. Where and when? A. I made tests for that purpose. Q. What did you do to make a test? A. I took the material—pasty-like material—the deposits in the bottom of the water courses; I took a hose with a pressure of twenty-five pounds to the square inch and demonstrated the fact. Q. Never mind what you demonstrated; what you did. A. Well, I took a three quarter of an inch hose—a three quarter hose, rather—to which was attached an ordinary garden nozzle, and I directed the stream upon this body or mass of coal dirt deposit, and found that by applying the stream above the mass that was deposited on a plank, that the water simply shot around and would not dissolve it. I found that it would simply bore—in throwing it into the center of the mass—simply bore it into the center of the mass without dissolving. I then made an application to sand and gravel, and I found that by playing the stream above the mass on the plank, that it simply dissolved and washed it out. There is a difference between sand and coal mud deposits; one is a sticky matter. Q. Where did you get this mud from you practiced on? A. Mud deposit in the Little Panther creek of the Lehigh Coal and Navigation—the wash sediment from the treatment of coal. Q. How much of this stuff did you take out of the pond? A. I suppose I took a mass of about—of about an ordinary bottleful. Q. Pail full? A. Yes; and allowed it to settle; put it on a plank, the plank being set at a pitch corresponding with the angle        Q. Then you took a garden hose and turned the water on? A. I placed this mass of putty-like material, which is either made by coal dirt, dust and buckwheat, and pea coal—I placed that on a plank at an angle similar, or as nearly as possible to the pitch of the mill race, and then tried, as I told you, the water in two ways on it. Q. You took the garden hose and turned the water on it? A. I did. I tried the water from this hose upon this mass at a pressure of twenty-five pounds to the square inch. Q. Listen to my question: You took a garden hose and turned hose on this mud and stuff which you put on the plank? A. No—beg pardon; turned

the water on.  Q. You took a garden hose and turned the water from the hose on it?  A. Yes.  Q. You think that is smart?  A. No; I think that is straight and correct.  Q. How did you know there was a pressure of twenty-five pounds to the square inch?  A. Because that was the pressure indicated. Q. Indicated where?  A. In the water company's office here in Wilkes-Barre.  Q. Did you go to the water company's office and find that on that day there was a pressure of twenty-five pounds on the main?  A. I did.  I made inquiry of Jones.  Q. You inquired of somebody what the pressure there was on that day?  A. The superintendent or—    Q. And that is the way you found there was a pressure of twenty-five pounds on the main?  A. On the main.  Q. Therefore you assumed the pressure came out of the nozzle of the garden hose was twenty-five pounds to the square inch?  A. Yes.  Q. And that is all you know about that pressure that day?  A. That is all I know about that particular pressure.  Q. What day was that?  A. I can give you approximately the day by reference to my notes.  It was some time in the year 1890, if I remember right.  Q. Spring, summer, or fall?  A. It was along in the spring, as I now remember.  Q. What month?  A. I can tell you that later.  I have the day when I did the work. Q. I wish you would find out that day.  A. I will; I will give you that."

Plaintiff proposes to prove by the witness that it would be impossible to flush this mill dam, race and reservoir out.  Defendants object, on the ground that it is in the nature of expert testimony, and the witness is not qualified to speak on the subject as an expert.

The Court: I think he is qualified to express an opinion.

Objection overruled, question allowed, evidence admitted, exception noted and bill sealed for defendant. [1]

Jasper Shoemaker on the stand:

" Q. What business have you been in most of your lifetime? A. In the woolen business, manufacturing.  Q. Water or steam?  A. Principally steam; partly water, though.  Q. Have you been in this mill of Mr. Stevenson's?  A. Yes, sir.  Q. Examined it?  A. Yes, sir.  Q. Take that mill there as it stands, the machinery and water power—twenty-five horse power, I believe—what, in your judgment, pure, clear water feeding that mill, would that mill be worth?"

Objected that it has not been shown that the witness is qualified to give this testimony.

The Court: Find out what he knows about this mill, and what knowledge and experience he has of mills constructed and operated as this was.

"Q. You live in Lackawanna county? A. Yes, sir. Q. How long have you been familiar with mills somewhat similar to this? A. Oh, I have been familiar forty or fifty years. Q. Have you known of mills like this to be bought and sold during your experience? A. I don't know as I know of any to be sold. I know about what the value of them has been. I do not know of any mill where they have been sold. Have worked in a good many different mills, but I never knowed one to be sold. Q. Never knew of any mill to be sold? A. No; I do not. Q. And you own mills yourself? A. Yes, sir. Q. You know the value of water power, do you not? A. Well, yes; I am somewhat acquainted with water power—the value of it."

The Court: "Q. Have you known, at any time within recent years, of the prices at which mills like the one in question have been held? A. No; I do not. As a general thing those mills are generally held pretty high, because the business, as a general thing, is a paying thing, and when a man has a paying thing he holds his plant pretty high. Q. They are not usually on the market? A. No, sir; I never heard of but one in all my knowledge that was on the market; that was some few years ago, and that was a mill in Centre county. I saw an advertisement in the Philadelphia paper. Q. Was that sold? A. I don't know whether it was sold or not; I never had heard. Q. How often have you been in this mill? A. Oh, I was only down that one time and I went through it. Well, no; I was through it a couple of times. I went through it with the jury, and I went through it myself before. Q. Examined it carefully? A. Yes, sir. Q. So that you are familiar with the mill? A. Yes, sir."

Defendants' counsel still objects.

The Court: I am inclined to accept the evidence for what it is worth, letting the jury pass upon its value under such instructions as I think the court is bound to give. The objection is overruled. Note an exception.

Bill sealed for defendant. [2]

W. Scott Halfpenny was asked these questions:

" Q. What is your business?    A. Woolen manufacturer. Q. How long have you been engaged in woolen manufacture? A. Pretty nearly all my life.    Q. Water or steam?    A. Steam. Q. Ever been in that business, using water?    A. No.    Q. Running mill by water?    A. No, sir.    Q. How long have you owned a mill yourself?    A. Been interested in a mill there about thirty-two years.    Q. How old are you?    A. Fifty-five. Q. Have you been through this mill?    A. I have.    Q. Have you examined it?    A. Kind of a general examination.    I did not examine it particularly.    Q. Did you examine the water power there?    A. I saw the water power.    Q. The water power that is actually in use, I mean?    A. No; I never saw the mill running.    Q. Take this mill built for a two-set mill, with the water power of forty horse, for the purpose of running the mill, what, in your judgment, would the machinery and mill and water power be worth?"

Objected to, on the ground that the witness has not qualified himself to testify as an expert; the mill he is operating being run by steam and situated in the borough of Lewisburg, a distance of nearly one hundred miles from here; that he has had no experience with water power; has not testified he knows of any sales of mills of this kind or any like it, etc.

The Court: I think that is right so far.

" Q. Are you familiar with horse power, as an owner of a mill?    A. I am familiar with horse power produced by steam."

The Court: Better find out if the witness has sufficient knowledge.

" Q. Have you been in other mills besides your own—woolen mills?    A. I have been in other mills; yes, sir.    Q. Familiar with other mills—with their running capacity?    A. I think I am; yes, sir.    Q. What mills?    A. I have been in the Muncy mill.    Q. What is the Muncy mill?    A. It is a two-set mill, run by steam.    Q. What other mills?    A. Been in Williamsport mill; that is run by steam.    Q. Have you been in mills that have been run by water?    A. One at                , run by water and steam; usually water.    Q. How often have you been there?    A. Oh, possibly a dozen times.    Q. You are familiar with that mill, are you?    A. Well, yes; I might say I am familiar.    Q. What, in your judgment, is this mill of Mr.

Stevenson's that you have made an examination of—what, in your judgment, is that mill, machinery and water power worth? "

Defendants renew the objection that the witness is incompetent.

The Court: " Q. From your knowledge of mills that you have mentioned, their operation, and from your examination of the mill in question, do you consider yourself competent to express an opinion as to its fair market value? A. Its market value? Q. Yes. A. No; I do not; not its market value."

The Court: The objection is sustained.

" Q. Can you wash wool in water that is blackened with coal dirt and filled with coal dirt? A. Well, I never tried it, but my opinion is you cannot. Q. What kind of water is essential to the washing of wool? A. Pure, soft water. Q. Did you, when you were down at this mill, examine the condition of Nescopeck creek? A. I saw Nescopeck creek; yes, sir. Q. Did you see the mill race and dam of Mr. Stevenson's? A. Yes, sir. Q. And reservoir? A. Yes, sir. Q. Whether or not that mill, standing there as it was when you saw it, taking into consideration the condition of the mill race and dam of Nescopeck creek—whether or not that has any value as a woolen mill."

Objected to, because the witness has stated that from all his knowledge on the subject he is not qualified to pass upon the value of this mill.

The Court: Value as a mill?

Plaintiff's counsel: Yes, sir; value as a woolen mill.

" Q. Whether or not that mill standing there as it is, taking into consideration the condition of the water there, that mill has any value as a woolen mill."

Defendants object to the question, on the ground that the witness, according to his own testimony, is incompetent to answer the question. Objection overruled. Exception noted and bill sealed for defendants. [3]

Judson W. Mott on the stand:

" Q. Where do you live? A. Near Montrose. Q. What business are you in? A. Woolen manufacturer. Q. How long have you been in that business? A. Off and on since I was a boy, fifty odd years. Q. What kind of a mill do you

run? A. I have a water mill. Q. Acquainted with other water mills around? A. I have been at others, in others. Q. Do you know of sales of any water mills at any time? A. I do not. Q. How long have you owned and run a water mill? A. I think since 1862; probably 1862 or 1863. Q. Are you familiar with Stevenson's mill? A. Not very; no, sir. Q. Have you been down there? A. I have been down there. Q. Examined it? A. Yes sir. Q. Examined the water there in the creek—tail race? A. There is no water in the tail race. Q. There was none there when you were there? A. No. Q. In the mill race? A. No, sir. Q. Or the reservoir? A. Yes, sir. Q. From your examination of that mill, what would you say that mill built for a two-set mill—what the mill, the machinery, and the forty horse power there would be worth?"

Senator Wolverton: "Q. Have you sold any mills or bought any mills of this kind, within the last——A. No, sir; I built this mill I have got now; burned up at one time and we built—about 1865 or 1866, somewhere along there. Q. Thirty-seven years ago? A. Yes, sir. Q. Have you known of any mills in the vicinity or within thirty or forty miles of here, or fifty miles, being sold? A. No, sir. Q. Within the last ten years? A. No, sir. Q. You don't know anything about the values of these mills from any knowledge of sales, either private sales or public sales? A. No; not from that. The only knowledge I have is from building this mill. Q. Where is your mill? A. Near Montrose. Montrose is my post office; just outside of the borough. Q. What is the size of your mill? A. The building, thirty by sixty, three stories high, basement, stone foundation, basement all stone and the stories above are wood. Q. Steam or water? A. We have both. Q. Why both? A. Well, I had some trouble with the water company, tried to get my water at one time. I could not run because they had the water shut off, and I put in steam. In the mean time the matter got adjusted, and since that been running with water."

Defendants' counsel object to the question of plaintiff's counsel in regard to the value, on the ground that the witness, according to his own testimony, is not competent to fix a value upon this mill, as the only knowledge he has of the value of fulling mills is derived from the expense of building one for himself thirty-seven years ago.

The Court: I think it has been held where there have been
no sales within a reasonable period of time, that of necessity
any man having a reasonable amount of knowledge may ex-
press his opinion of what it is worth.   This witness, evidently
having knowledge of the construction and operation of a water
mill, and having examined the mill in question, his evidence
is admitted.   The objection is overruled and exception noted.

Bill sealed for defendants. [4]

James Coutler on the stand:

### DIRECT EXAMINATION.

Mr. Lenahan : "Q.  Where do you live?  A.  I live in Muncy.
Q.  What business are you in?   A.  I am a woolen manufac-
turer.   Q.  What kind of a mill have you—steam or water?
A.  We have a steam mill now.   Q.  Did you ever own a water
mill?   A.  I have—well, I have run.   Q.  You have run water
mills?   A.  Yes ; I have run water mills.   Q.  Whether or not
you have been in a number of water mills.   A.  Yes, sir; I
have worked in three different water mills.   Q.  Have you been
down at this mill of Mr. Stevenson's?   A.  I was there twice ;
yes, sir.   Q.  When were you there?   A.  About three years
ago.   Q.  What did you go there that time for?   A.  I went to
look at a lot of wool he had there for sale.   Q.  Did you ex-
amine the mill at that time?   A.  Well, I went through the
mill.   Of course, as a manufacturer, I naturally look around to
see what there was there.   Q.  Do you know of water woolen
mills being sold in your locality, or anywhere?   A.  No;
there has been none sold that I know of for some time—
none that I know of.   Q.  Considering the fact that this mill
is there, with forty horse power they can use, what would you
say, with a clear, pure stream of water feeding it, that mill, the
machinery and the forty horse power would be worth?"

Senator Wolverton : "Q.  Do you know of any mills being
sold within the last twenty years, within a radius of fifty miles
or more—woolen mills?   A.  I don't know that I have.   I
have read an account —— Q.  Did you sell or buy any your-
self?   A.  No.   Q.  You never sold a mill?   A.   Never sold a
mill; no, sir.   Q.  Never bought one?   A.  Never bought
one ; that is, built a mill, but never bought one already built.
Q.  But you built one?   A.  Yes, sir.   Q.  That is the one you

are now running?   A. The present mill; yes, sir.   Q. When? A. In 1883.   Q. Operated by steam entirely?   A. Entirely by steam; yes, sir."

Defendants' counsel object to the question asked, on the ground that the witness is not shown by his testimony to be qualified to pass upon the question of value of plaintiff's mill and machinery.

The Court: "Q. Have you such knowledge of the construction and operation of water mills, of the character similar to the one in question, and also such knowledge of the plaintiff's mill that you consider yourself competent to express an opinion as to its value, under the conditions specified in the question?   A. I think I have."

The Court: The objection is overruled.   Note an exception. Bill sealed for defendants. [5]

Ira Hartwell on the stand:

"Q. How much would it cost to convey water from that stream or from a spring alongside of it to the plaintiff's mill?"

Objected to as immaterial and irrelevant.

Defendants propose to prove by the witness on the stand that on plaintiff's own property, within a half a mile of plaintiff's mill there is a spring and stream of pure water, as shown by plaintiff's witnesses, and that this can be conducted to the plaintiff's mill by the laying of a two-inch water pipe, at a cost of less than $500, and that the quantity of water conveyed will be more than twice the amount proven by the plaintiff as necessary for the operation of his mill in washing wool and in preparing his cloth for the mill and for drinking purposes.

Plaintiff's counsel object: 1. That it is immaterial and irrelevant.   2. That in order to conduct this water he would have to cross the land of other owners.   3. He could not, by an artificial process, divert this stream from the way it flows by nature.

Defendants offer, in addition, to prove that defendants, or one of them, offered to construct a pipe and procure the right of way, furnish the water, delivered at his mill in more than sufficient quantities to serve him for drinking purposes and washing his wool and running his mill, and that he accepted the offer, but subsequently rejected it—agreed to it, but subsequently refused to abide by his agreement.

The Court: I do not think he would be bound by any substitute that you would offer; and unless he was so bound, unless ordinary prudence would go so far as to require him to accept that, I cannot see how it would be relevant.

Senator Wolverton : This is offered for the purpose of bearing on the question of the measure of damages in this case.

The Court: The objection is sustained; the evidence is believed to be irrelevant.

Exception noted and bill sealed for defendants. [6]

Defendants' points were as follows :

1. That it was the duty of the plaintiff to furnish testimony showing the quantity of culm or coal dirt in his mill race and dam and the cost of the removal of the same, and not having furnished any testimony on the cost of removal of the culm, the testimony of the witnesses for the defendants as to such cost, showing that the culm can be removed for less than the value of the property, stands uncontradicted, and the jury must be governed by this uncontradicted testimony. *Answer :* With the exception of some testimony by Mr. Dodge upon cross-examination with regard to the cost of excavating the culm from the race, and possibly from some other part of the waterway, there is no testimony that I recall on the part of the plaintiff with regard to the cost of the removal of the culm. So that if you should find it was reasonably practicable to remove the obstruction, then this point would be correctly stated. That is to say, the testimony of the defendants' witnesses as to the cost of removing it is the only testimony, and would be uncontradicted.    With that qualification the point is affirmed. [7]

4. The defendants are not liable to the plaintiff for any damages for the pollution of the water of Nescopeck creek through his premises or for any injury to his wells on said premises by reason of sulphur water, for the reason that under all the evidence in this case, the removal of sulphur water from the defendants' mines is absolutely necessary to enable them to mine coal, and sulphur water cannot be prevented from running into adjacent streams, and thence finding its way into Nescopeck creek and through the plaintiff's property.   The defendants cannot be required to stop the operation of their mines, because necessarily in the mining of coal, mine and sulphur water may pol-

lute the stream through the lands of a lower riparian owner or injure the water of a well on his premises. *Answer :* So far as that point refers to the water discharged from the mine in its ordinary operation it is correct, and in that light it is affirmed. Otherwise I could not affirm it. That is to say, if it has reference to a great accumulation of water being discharged, as the water was discharged in 1894 through the Jeddo tunnel, then, in my judgment, it would be incorrect, and would not be true as to such a discharge of water. It would be true, however, as far as the ordinary, everyday operation of the mines is concerned, and the water necessarily taken out from day to day by such operation. [8]

7. The uncontradicted evidence being that the plaintiff purchased the premises, upon which he subsequently erected his woolen factory in 1878, consisting of 117 acres, known as the Old Forge property, with house, barn, etc., thereon, for the sum of $2,000, and that he subsequently erected a woolen factory and repaired the old dam and race ; the damage suffered by the plaintiff is the loss or injury sustained to the entire property; and the uncontradicted testimony of several of defendants' witnesses being that the culm or coal dirt can be removed and sufficient water furnished to successfully operate the plaintiff's mill, the verdict should not exceed the sum necessary to remove the culm from the dam, race and pool, together with a sum sufficient annually to keep the same free from culm, and together with the further sum necessary to pay for the land covered with culm. *Answer :* Refused without reading. [9]

8. That if the jury find the plaintiff is entitled to recover, the true measure of damages for permanent injury in this case is the cost of removing the culm or coal dirt, unless the expense of removal of the coal dirt exceeds the value of the entire property, in which case the value of the property is the limit of the measure of damages, and in no event can there be a recovery in excess of the value of the entire property for the permanent injury. *Answer :* I take the term " entire preperty " to mean the entire property destroyed. If you find that the property was injured beyond remedy, or that the cost of repairing the injury would exceed the value of the property, you may award the plaintiff the value of the mill property with its water power and these eight or ten acres of land and the well, pro-

vided you find that the well was destroyed independently of the sulphur water that found its way into this stream from the ordinary operation of these mines which had been going on for years before the plaintiff went to reside on the premises and has continued ever since. [10]

In answer to a question from a juror the court charged in part as follows:

Juror: Whether we can allow the value of the property at the time it ceased operation only, or whether we can, in addition, allow for loss of business.

The Court: If you assess the damage as the value of the property at the time when the mill became stopped, you can allow nothing except the fair value of the property as you shall find it to have been at that time, unless you allow a further sum for the detention of damages, not to exceed the legal rate of interest. As, for instance, suppose you find that in 1898 the obstruction had become so complete that the operations of the mill were entirely stopped, assuming now that you have found that the obstruction was of such a character it could not be removed, then you would determine the fair market value of that property at that time, taking into consideration not only the testimony of the plaintiff's witnesses, but also the testimony of the defendant's witnesses, the character of the equipment, the length of time it had been in use, taking all those things into consideration, find the value at that time. Say that were in 1898, 1899, or 1900, whatever time you find the operations of the mill were completely stopped, it would then be in your discretion to add a further sum by reason of the detention, not to exceed the legal rate of interest upon the value so found down to the present date. I deem it my duty to say to you that in fixing the value of the property you will remember that the mill buildings and the machinery would still be there. If from the evidence you can find they had any intrinsic value, or that there would be any salvage to the plaintiff, notwithstanding the destruction of the water power and the complete stopping of his operations, for the value of that salvage I think you would have to make an allowance. That is to say, you would have to deduct the value of that salvage from the value of the property. And then upon that balance you may allow a further

sum, as I have said to you, not to exceed the legal rate of interest from the time you find the operations were completely stopped. This is a discretionary power you have, this allowance of a further sum, sometimes called interest, but not strictly so. You are not bound to allow it, but you have it in your discretion to allow it if you see fit. [12]

Verdict and judgment for plaintiff for $21,000. Defendants appealed.

*Errors assigned* were (1–6) rulings on evidence, quoting the bill of exceptions; (7–12) instructions as above; (13) that the verdict was excessive.

*H. W. Palmer* and *S. P. Wolverton*, with them, *A. H. McClintock*, *P. V. Weaver* and *J. B. Woodward*, for appellants.—The testimony of the witnesses offered as experts was incompetent because it did not give, nor did they profess to give, the market value, but instead, intrinsic value, i. e., what the value of the mill would be if there was a ready sale for its product, based upon its original cost, less something for depreciation : McEwen v. Bigelow, 40 Michigan, 215.

Interest is recoverable of right, but compensation for deferred payment in torts depends on the circumstances of each case. The plaintiff may have set his damages so inordinately high as to have justified the defendant in refusing to pay, or in other ways the delay may be plaintiff's fault, or the liability of defendant may have arisen without fault: Meyer's App., 179 Pa. 157; Phila. Ball Club, Ltd., v. Phila., 192 Pa. 632; Richards v. Citizens Natural Gas Co., 130 Pa. 37.

The verdict in this case is manifestly excessive : Smith v. Times Pub. Co., 178 Pa. 481; Wolf v. Phila. Traction Co., 181 Pa. 399.

*John T. Lenahan* and *John M. Garman*, for appellee.—The competency of a person to give his opinion as an expert, if on a preliminary examination he appears to have any pretensions to speak as such, rests much in the discretion of the judge trying the case : The Ardesco Oil Co. v. Gilson, 63 Pa. 146.

It would not make the slightest difference whether plaintiff's property was permanently or temporarily injured; in neither

case could defendants force on him a substitute for what they had deprived him of: Stevenson v. Ebervale Coal Co., 201 Pa. 112; Kennedy v. Forest Oil Co., 199 Pa. 644.

The plaintiff is entitled to damages for the destruction of his property estimated with reference to its actual value to him: 1 Sedgwick on Damages, sec. 252; Trout v. Kennedy, 47 Pa. 387.

Plaintiff was entitled to compensation for delay: Klages v. Phila. & Reading Terminal Co., 160 Pa. 386; Becker v. P. & R. R. R. Co., 177 Pa. 253.

The verdict was not excessive: Rudolph v. Penna. Schuylkill Valley R. R. Co., 186 Pa. 555; Patton v. Phila., 189 Pa. 602; 3 Sedgwick on Damages, sec. 1322.

OPINION BY MR. JUSTICE DEAN, June 4, 1902:

Nearly all the assignments of error in this case have been, in substance, passed upon in appeal between same parties, opinion by Justice BROWN, 201 Pa. 112. The history of the case, in any of its material facts, has not been changed by the trial which has resulted in this appeal. As we read the testimony of the witnesses as to the market value of the property before the damage complained of and its market value as affected by the wrongful acts of defendants, the verdict approaches the verge of that excessiveness, which in Smith v. The Times Publishing Co., 178 Pa. 481, moved us, under the power conferred by the act of May 20, 1891, to interfere. As a majority of the court held in that case, although a power which the legislature in the exercise of its functions under the constitution might confer, it was one rarely to be exercised. It was exercised for the first time in that case, seven years after the passage of the act; we have persistently declined to invoke it since, although often urged so to do. And while it is argued earnestly by appellant's counsel, that this case calls loudly for our intervention, we do not think this verdict is so excessive as to move us to reverse, for that reason.

As to appellant's first assignment of error, which alleges certain witnesses were incompetent to speak as experts, their incompetency is not so apparent, as will induce us to declare the admission of their testimony was error. The incompetency of such testimony is sometimes so glaring as to make it clearly

inadmissible.  But, generally, that is a question for the discretion of the trial court.  As we said in Delaware, etc., Steam Towboat Co. v. Starrs, 69 Pa. 41, " if the court should think they are prima facie qualified, it will then be for the jury to decide whether any, and, if any, what weight is to be given to their testimony.  It is a matter very much within the discretion of the court below, and if it appears that the witnesses offered, had .any claim to the character of experts, the court will not reverse on the ground that their experience was not sufficiently special."  And this applies to the second, third, fourth, fifth and eleventh assignments ; they are all overruled.

As to the sixth assignment, appellants offered evidence to prove that plaintiff could procure pure water from another source.  This testimony the court rejected.  We said in the former opinion in this case, that plaintiff " had the right to use this water as it naturally flowed over his own property," and that his right to decline the use of any other water was just as absolute as to enjoy his own unpolluted.  We cannot see how such evidence could be used in mitigation of damages for infringement of an undisputed right.  No wrongdoer can trespass on the right of a citizen and mitigate his wrong by saying, " You can secure as valuable a right elsewhere."

Error is alleged in the answers of the court to defendant's first, seventh, eighth and eleventh written prayers for instruction on the question of damages.  These answers, when read in connection with what is said in the general charge, are substantially correct.  In the former opinion our Brother BROWN laid down the rule for the computation of damages as follows : " The cost of removing the culm or coal dirt, unless the expense of removal exceeds the value of the entire property, in which case the value of the property is the limit of the measure of damages, and in no event can there be a recovery in excess of the entire property for the permanent injury."  In language plain enough to be understood by the average juryman the court followed this rule.  Judging from the weight of the testimony as read in these paper-books, the jury did not strictly heed the instruction : we cannot certainly tell, for the evidence in print may not accurately convey to us the truth as it did to the court below.  Apparently, the cost of removal and any loss of business occasioned by the wrong was far less than the amount of

the verdict. It is argued by appellee's counsel that the culm cannot be removed; this is a mistake, for if it were solid rock it could be removed. But assuming that the act of defendants had resulted in an entire destruction of the mill property as such, the apparent variance between its market value and this verdict is quite large. It was the clear duty of the court below, in peremptory language, to hold the jury down to the lawful damages and if they disregarded the instruction to set aside the verdict. What the plaintiff had a right to ask was, that he be made whole, not rich. It was the duty of the court to see that this result, and this alone, was reached. But in review, we in this case can go no farther than to say the instruction was not erroneous.

The twelfth assignment, to part of the charge of the court on the measure of damages, raises a point not without merit. The court says : " Taking into consideration not only the testimony of plaintiff's witnesses but also the testimony of defendants' witnesses, the character of the equipment, the length of time it had been in use, taking all those things into consideration, find the value at that time. Say that were in 1898, 1899 or 1900, whatever time you find the operations of the mill were completely stopped, it would then be in your discretion to add a further sum by reason of the detention, not to exceed the legal rate of interest upon the value so found down to the present date." The court then further says, " This is a discretionary power you have, this allowance of a further sum called interest, but not strictly so." In Phila. Ball Club v. Phila., 192 Pa. 632, we said : " In a land damage case, the owner of the land is not entitled to damages for detention of payment, where it appears that the detention was caused by his grossly excessive and unreasonable demands, which it was the duty of the officers of the city to resist." And then further in same opinion is this language : " But it must not be expected, that the imaginary, remote, speculative and illegitimate demands that have thus far been set up, or any others of like character will ever receive the sanction of this court," but in an earlier case, Richards v. Citizens' Natural Gas Co., 130 Pa. 37, Justice MITCHELL, speaking for the whole court, discussed this question and clearly pointed out the distinction between cases where compensation for detention of damages in the nature of interest might be al-

lowed and where it should not. He says: " Interest is recoverable of right, but compensation for deferred payment in torts depends on the circumstances of each case. The plaintiff may have set his damages so inordinately high as to have justified the defendant in refusing to pay. Or in other ways the delay may have been the plaintiff's fault. . . . In such cases the jury would not, and certainly ought not, to make the allowance."

Here the plaintiff in his statement claimed specifically for the deposit of culm and the interruption of business at the mill, $75,000 ; then further, for the pollution of the stream, and the destruction of about twenty acres of land, for agricultural purposes, $25,000 more, making altogether $100,000. Perhaps, the mere averments in the statement would not of themselves be sufficient to warrant the belief of an extortionate demand, for it is a common practice in pleading to fix the amount claimed at a higher sum than the plaintiff is willing to accept or expects to get, but here the unconscionable demand in the statement is followed by a like demand at the trial. The two sons of plaintiff, Charles and William Stevenson, were both called by plaintiff as witnesses and each computed the damages at $100,000. So incredible was their testimony and so exhorbitant the demand, that the court felt compelled to instruct the jury, practically, to disregard both. Beyond question, the plaintiff set his demand inordinately high; defendants must resist by litigation with its consequent delays. Therefore, they were excusable in not promptly paying, and should not be subject to a penalty for nonpayment. The jury should have been peremptorily instructed, that under these circumstances damages for detention, not to exceed legal interest, should not be allowed; that they had no discretion in the matter. To this extent the twelfth assignment of error is sustained, the judgment is reversed and v. f. d. awarded.