434 A.2d 728

Carol M. WRIGHT & Clarice Wright, his wife, Steve M. Laskosky, Mike Watona & Martina Watona, his wife, J. B. Miller & Irene E. Miller, his wife, and Angelo DeLuca & Mary DeLuca, his wife, Appellants at 353,

v.

The BUCKEYE COAL COMPANY, Appellants at 284.

Superior Court of Pennsylvania.

Argued Nov. 11, 1980.

Filed Aug. 21, 1981.

Henry Ingram, Pittsburgh, for appellant at No. 284 and for appellee at No. 353.

Simon B. John, Uniontown, for appellants at No. 353 and for appellees at No. 284.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This is an equity action by the owners of five private homes to recover for damage they say was done to their

home by subsidence incident to coal mining. The chancellor awarded damages. The home owners have appealed, claiming that the damages were inadequate. The coal company has also appealed, claiming that its liability was not proved, but that if liability was proved, damages were not. We have concluded that liability was proved. However, we are unable to determine from the chancellor's findings on what basis he computed damages. Accordingly, we shall remand for further proceedings. For convenience, we shall speak as though only one appeal had been taken, and refer to the coal company as appellant and to the home owners as appellees.

Appellees' complaints were filed February 1, 1974. They allege that appellant violated appellees' rights under the Bituminous Mine Subsidence and Land Conservation Act of 1966, Act of April 27, 1966, P.L. 31 §§ 1–19, 52 P.S. § 1406.1 *et seq.*[1] On April 3, 1974, appellant filed preliminary objections challenging the jurisdiction of the lower court on the theory that the Act of 1966 provided appellees with an exclusive administrative remedy. On September 6, 1974, the lower court dismissed the preliminary objections, and appellant appealed to the Supreme Court. The Supreme Court affirmed, with costs on appellant. *DeLuca v. Buckeye Coal Co.*, 463 Pa. 513, 345 A.2d 637 (1975). The actions were consolidated and tried on May 7 and 18, July 26, and August 2, 3, and 4, 1977. R.2a. On July 7, 1978, the chancellor issued an opinion holding appellant liable for subsidence

---

1. Appellees rely on the following provision of the Act of 1966:

 In order to guard the health, safety and general welfare of the public, no owner, operator, lessor, lessee, or general manager, superintendent or other person in charge of or having supervision over any bituminous coal mine shall mine bituminous coal so as to cause damage as a result of the caving-in, collapse or subsidence of the following surface structures in place on the effective date of this act, overlying or in the proximity of the mine:

 (1) Any public building or any noncommercial structure customarily used by the public, including but not being limited to churches, schools, hospitals, and municipal utilities or municipal public service operations.

 (2) Any dwelling used for human habitation; and

 (3) Any cemetery or public burial ground. 1966, Special Sess. No. 1, April 27, P.L. 31, § 4.

 52 P.S. § 1406.4.

damages, but ordering a further hearing on the amount of damages. On March 22, 1979, after the hearing, the chancellor issued a second opinion, with findings of fact and conclusions of law, awarding damages. Appellant filed exceptions, which were dismissed, and on February 27, 1980, the decree nisi was made final.

Appellees' properties are within 200 feet of Route 88, in Cumberland Township, Greene County, and are over a portion of appellant's Nemacolin Coal Mine. Def. Exhibit # 9. The Nemacolin Mine was first mined in the late 1920s, when several passageways, subpassageways, and cross-cuts were made in a seam of coal about 400 feet below the surface. After this work, mining stopped. Late in 1968, however, appellant notified appellees that it intended to resume mining. This second stage of mining, which was called "retreat mining," consisted of the systematic removal of coal from the coal "pillars" that remained after the development work. It started January 1, 1970. Appellees contend that when appellant removed the coal from the pillars, sometime after January 1, it either upset or removed too much coal, leaving the overlying stratum with insufficient support. *See generally*, for a discussion of development and retreat mining, *Safety and Management Problems in Mine Operations in Pennsylvania*, 52 P.S. XIX–XX.

The chancellor's findings of fact and conclusions of law were, issued on March 2, 1979, were as follows:

## FINDINGS OF FACT

1. The Nemacolin Mine is an underground coal mine located in Cumberland Township, Greene County, Pennsylvania, and at the time was owned and operated by the Buckeye Coal Company.

2. The common mining practice of the mine is to cut sixteen to seventeen foot wide entries through the Pittsburgh Coal vein on ninety five foot centers.

3. All five of the plaintiffs' homes are located above the mine, at a place in the mine identified as Six Right off Two North, approaching the 118 Road Section.

4. The area was initially developed in 1928 and 1929, by entries driven twelve feet wide, and 5½ to 6 feet tall, on 100 foot centers, leaving 87 to 88 foot square pillars.

5. The area was not further mined until 1970, commencing January 1 and this was done in compliance with the requirements of the Mine Subsidence Act as to notice and the state prescribed formula for support.

6. That the coal recovery in the area, at and after January 1, 1979 [*sic*; no doubt a typographical error for 1970], immediately beneath the location of the plaintiffs' homes, caused the dropping and shifting of the surface, even though the same was of a relatively slight nature, to cause a consequent damage to the homes as evidenced in the cracks which appeared in the masonry walls, the plaster walls, and some damage to door jambs, floors, concrete floors and other portions of the homes.

7. That each of the homes was 20 years old or older, and prior to the time of the mining, had suffered some of the normal dissipation of structural condition, but that each of the homes, as a result of the mining and the movement of the sub-surface thereunder, suffered an acceleration of the deterioration, and direct injury to the homes, which has and will necessitate the expenditures of monies to restore and return the same to their condition immediately prior to the commencement of the mining.

## CONCLUSIONS OF LAW

1. That the plaintiffs have established by a fair preponderance of the evidence that as a result of the mining by defendant, in close proximity of their homes, under the principle of absolute liability imposed by the Mine Subsidence Act of 1966, their homes suffered direct resultant damages to their homes.

2. That the defendant, under the terms of the Act, owes an absolute duty of surface support, which existed at

common law, *Pennsylvania Coal and Coke Corp. v. Duncan Spangler Coal Company*, 333 Pa. 272, 3 A.2d 356 (1939), and was thereafter spelled out legislatively in the Mine Subsidence and Land Conservation Act of 1966.

3. That as a result of the mine subsidence damage to the homes, the defendant is liable to the homeowner plaintiffs as follows:

| | | |
|---|---|---|
| a. | For Steve Laskosky, et ux | $7700.00 |
| b. | For Carol M. Wright | 7700.00 |
| c. | For J. B. Miller, et ux | 7100.00 |
| d. | For Mike Watona, et ux | 9300.00 |
| e. | For Angelo DeLuca, et ux | 4800.00 |

And in addition to the principal sum, interest thereon shall be computed from January 1, 1975 to the present.

1

 When approved by a court *en banc* (which here consisted of only the chancellor himself), the findings of a chancellor have the effect of a jury verdict, and therefore, if supported by adequate evidence, will not be disturbed on appeal. *Bedillion v. W.A. Stave Co. Inc.*, 271 Pa.Super. 292, 413 A.2d 411 (1977). An appellate court is free, however, to review a chancellor's conclusions—either of law or ultimate fact. *Kemp v. Majestic Amusement Co.*, 427 Pa. 429, 234 A.2d 846 (1967); *Hengst v. Hengst*, 269 Pa.Super. 110, 409 A.2d 88 (1979), *rev'd on other grounds, Hengst v. Hengst*, 491 Pa. 120, 420 A.2d 370 (1980).

 Here, our review of the record reveals sufficient evidence to support the chancellor's finding that appellant caused appellees' properties to subside.[2] However, as to the chancellor's findings on damages, the case is quite different.

2. Appellees' evidence consisted mainly of their own testimony concerning their observations of cracks and fissures in their properties, ground movement, and other indications of subsidence, such as noise; the opinion of two experts, Carl Carnein and Charles Yeloush-

In his opinion of July 7, 1978, the chancellor wrote that because of "a lack of reliable, accurate and worthy evidence of the damages before us, we will direct further hearings on this limited issue [of damages]." Slip op. at 7. In his opinion of March 22, 1979, immediately preceding his findings of fact, the chancellor wrote:

These cases were heard in full, and following the hearing, the Court entered a lengthy opinion, finding the defendant company to be liable, but having been dissatisfied with the quality of the testimony presented on the subject of damages, ordered additional testimony to be taken for that limited purpose. *At this hearing, very little new evidence was presented by either side, and the only evidence before the court is very much the same as that which was presented earlier,* that of Homer Miller, who, on behalf of the five plaintiffs, reiterated the repair estimates as to what, in his opinion, it will cost to restore the damaged homes. And, with inflation taking its voracious economic toll, the longer any of this remains unresolved, the greater becomes the financial hardship visited upon the parties.

In a review of the evidence before us on the issue of damages, we have, in addition to Mr. Miller's estimates, the testimony of the homeowners themselves, and also the Court made a view and inspection of the homes of the plaintiffs. These are all homes of an older vintage, that is 20 years or more, all reasonably maintained, and all, as is almost every home to its owners, more valuable to them than the values which might prevail on the open market. However, in regard to that last observation, no area of

an, as to the likely cause of the damage to appellees' properties; and the testimony of Homer Miller, a contractor, as to the cost of repairs. Appellant attempted to refute the testimony of appellees' experts by expert testimony of its own, and by demonstrating that it had left sufficient pillars in the mine to support the surface. Appellant attacks the sufficiency of appellees' evidence by contending that the chancellor erred in accepting the testimony of appellees' experts over the testimony of its own expert. Brief for appellant at 18–22; 37–39. We see no merit to this argument. *Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273 (1976); *Lobozzo v. Adam Eidemiller*, 437 Pa. 360, 263 A.2d 432 (1970); *Hankin v. Goodman*, 432 Pa. 98, 246 A.2d 658 (1968).

rapid price increase has been more obvious than in the house market in this area.

The chief difficulty in regard to settling the value of the damage to these homes is the separation of the part which results from the natural deterioration of the structure, and which part is the improvement required by the subsidence damage.

Slip op. at 1–2 (emphasis added).

■ Given this observation by the chancellor, we find it difficult to avoid the conclusion that he was forced to guess the extent of appellees' damages. As plaintiffs, the appellees were required to prove their damages, by a preponderance of the evidence. *See, Link v. Highway Express Lines, Inc.,* 444 Pa. 447, 282 A.2d 727 (1971); *Gordon v. Trovato,* 234 Pa.Super. 279, 338 A.2d 653 (1975). Damages not proved are not recoverable. *Maxwell v. Schaefer,* 381 Pa. 13, 112 A.2d 69 (1955).

■ In any case, whether or not he guessed, the chancellor has not provided us with any findings of fact in support of his computation of damages; nor can we tell from our own review of the record how he computed the damages. The only evidence of the extent of the damages in monetary terms was the testimony of Homer Miller, who visited each of the houses in June 1976. He estimated the cost of repairing the several homes to be: Laskosky, $12,190, N.T. v. 2 at 46–47; Wright, $12,000, *id.* at 47–48; Miller, $11,900, *id.* at 49; Watona, $15,650, *id.*; and DeLuca, $8,150, *id.* at 50. The chancellor, however, rejected this testimony as not "reliable, accurate and worthy." Slip op. of July 7, 1978, at 7.[3] We therefore do not know what evidence he relied on to make his award. In these circumstances we are obliged to remand for further findings and an explanation of the award. *Warden v. Zanella,* 283 Pa.Super. 132, 423 A.2d 1026 (1980).

---

**3.** Appellees' argument, on their appeal, that it was error for the chancellor to award less than the amount of damages Homer Miller testified to is thus without any merit; the chancellor was free to reject the testimony.

In this regard, we note that we share the chancellor's concern that the damages from subsidence were not distinguished from damage otherwise caused.

Some of the evidence suggests that some of the damages may have occurred before appellant's mining operations were close enough to appellees' homes to have caused the damages. On cross-examination, appellees' own expert witness, Carl Carnein, testified that "[i]f no mining had occurred within 500' of the particular houses before the cracks [in the houses] appeared, I would say the cracks [were] not caused by subsidence." N.T. v. 1 at 198. Our review of the record indicates that as of January 1, 1970, appellant's retreat mining activities were at various distances from appellees' homes: DeLuca (575'); Laskosky (700'); Miller (700'); Wright (800'); and Watona (825'). *See* Defendant's exhibit # 9. Yet two of the five appellees testified that damage to their homes occurred on or before January 1, 1970. Clarice Wright testified, with absolute certainty, that damage to her home began on New Year's Day 1970, N.T. v. 1 at 27 and continued into the "early part of 1970". *Id.* at 30. J. B. Miller and his wife, Irene, testified that damage to their home began "approximately eight (8) to 12 (12) months" after they received notice from appellant of his intention to engage in retreat mining operations in the Nemacolin Mine, *id.* at 48 & 62, and that this damage continued thereafter. *Id.* Although the Millers could not remember when they received notice from appellant, our review of the record suggests that it was sometime in the latter part of 1968. *See id.* at 66, 83.

By July 1970 appellant had engaged in retreat mining well within the zone where its operations could potentially have caused subsidence. *See* Defendant's Exhibit # 10. We are unable to determine from the record, however, just where appellant was mining from January to July 1970. At least one appellee complains of damage to his property in this interval. Steve Laskosky testified that he first noticed damage to his home "anywhere from the 1st to the 10th of January 1970." N.T. v. 1 at 6. Angelo DeLuca was less

precise, stating only that his home first incurred damage "sometime in 1970," *id.* at 86, and Mike Watona testified that he first noticed damage to his home "maybe in the middle of 1970."

If the chancellor accepted Carnein's testimony, it would seem that he should have found that at least some of the damages complained of by appellees Wright and Miller were caused by something other than appellant's mining. Similarly, as to some of the other damages claimed, the chancellor's award would seem to depend on his appraisal of the evidence on where appellant was mining from January to July 1970, and when appellees' homes first incurred damage.[4]

Ordinarily, on the basis of the record we have before us, we would remand for further hearings so that the parties could introduce more evidence on the question of damages in light of this opinion. However, because we do not know, as we have no transcript of it, what evidence was introduced at the further hearing ordered by the chancellor in his opinion of July 7, 1978, we leave this decision to the chancellor. Should he decide, however, that further evidence is not needed, he should order all the testimony transcribed.

---

4. In his opinion of July 7, 1978, the chancellor said that "whatever damage there is occasioned by that [mining] operation, it occurred at the time of the initial work. . . ." Slip op. at 6. Also in this opinion he said that

while four of the plaintiffs claimed their damage started occurring in January of 1970, the Company, in its defense, pointed out that except for the original headings and cross sections which were driven in this area in 1928, no additional mining operations took place in this section until March of 1970, when the secondary recovery operations were begun.

*Id.* at 2.

However, in his opinion of March 22, 1979, the chancellor found that "the area was not further mined until 1970, commencing January 1, . . . ." Finding. # 5, and "[t]hat the coal recovery in the area, at and after January 1, 1979 [*sic*; no doubt a typographical error for 1970], immediately beneath the location of the plaintiffs' homes caused the dropping and shifting of the surface. . . .", Finding # 6.

There appears to be a conflict in these several statements as to whether the mining resumed in January or March 1970. Also, it would appear necessary to expand upon the phrases "this area," "this section," and "at and after January 1, 1970."

**2**

■ Appellant argues that in awarding damages, the chancellor should have awarded the cost of repairs or depreciation in market value, whichever was smaller. Brief for Appellant at 26–28. Although there are cases that seem to provide support for this proposition, *see e. g., Art Club of Philadelphia v. Heyman and Goodman,* 325 Pa. 587, 592, 190 A. 922, 924 (1937); *Weaver v. Berwind-White Coal Co.,* 216 Pa. 195, 65 A. 545 (1907); *Rabe v. Shoenberger Co.,* 213 Pa. 252, 62 A. 854 (1906); *Bunbarger v. Walker,* 193 Pa.Super. 301, 164 A.2d 144 (1960), the Supreme Court has held that it applies only where the damage was permanent. *Lobozzo v. Adam Eidemiller, Inc.,* 437 Pa. 360, 369, 263 A.2d 432, 437 (1970) (expressly refuting analysis in *Art Club of Philadelphia v. Heyman and Goodman, supra,* to the contrary). Where, as here, damage to a building is remediable, the "correct measure of damages is the cost of repair, unless that cost would exceed the value of the building." *Lobozzo v. Adam Eidemiller, Inc., supra,* 437 Pa. at 369, 263 A.2d at 437. Appellant introduced no evidence suggesting that the cost of repairing any of the appellees' homes would exceed the value of the homes. Accordingly, the chancellor did not err in using the cost of repairs as the basis for measuring damages.

**3**

■ Finally, appellant argues that the chancellor erred in awarding pre-judgment interest. We agree.

"An examination of the cases dealing with the charge and allowance of interest will disclose many difficulties, but the decided trend of the courts of law and courts of equity has been 'to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case' . . . Unless a case can be found, which is conclusive precedent, the safest and at the same time the fairest way for a court is to decide questions pertaining to interest according to a plain and simple consideration of justice and fair dealing."

*Murray Hill Estates, Inc. v. Bastin,* 442 Pa. 405, 410, 276 A.2d 542, 545 (1971) *quoting McDermott v. McDermott,* 130 Pa.Super. 127, 130, 196 A. 889, 890, (1938).

The chancellor, it will be recalled, awarded interest as of January 1, 1975. He does not explain the significance of this date, nor have we been able to think of any.[5]

Moreover, the chancellor's opinions suggest that on a "consideration of justice and fair dealing," the equities are not with appellees but appellant. Thus in his opinion of July 7, 1978, the chancellor said:

We agree that the Company has established a recognizable strong defense supportive of its contention that there was no vertical movement of the earth, and that, having accomplished the coal removal at that time in that area by well tested and well established mining practices, and in conformity with the provisions of the Act, there can be no liability to the property owners.

Slip op. at 5.

In contrast, in referring to appellees' presentation, the chancellor said that appellees were "magnifying the extent of the actual damages," slip op. at 6, and while he found this "understandabl[e]," *id.,* he nevertheless regarded their case as "lack[ing] . . . reliable, accurate and worthy evidence of

5. The date of January 1, 1975, appears to be unrelated to any of the crucial dates in this litigation, which are as follows: Damages were alleged to have occurred sometime in 1970; complaints were served on February 6, 1974; appellant filed preliminary objections on April 3, 1974; the lower court dismissed the objections on September 6, 1974, and appellant appealed to the Supreme Court, where the case was argued on March 25, 1975, and decided on October 3, 1975, with costs being placed on appellant; appellant filed answers to the complaints on December 19, 1975; the case was listed for trial in February 1976, but was removed from the list when *appellees* failed to respond to appellant's discovery requests; on September 17, 1976, appellees' counsel withdrew, and on September 22, 1971, new counsel entered an appearance; on December 9, 1976, appellant filed a motion for a rule to show cause why a judgment of *non pros* should not be entered; on January 7, 1977, the lower court dismissed the motion; the matter was finally brought to trial in May, July, and August of 1977.

the damages," *id.* at 7, and therefore felt obliged to order a further hearing limited to the issue of damages. However, when this hearing had been held, the chancellor said in his opinion of March 2, 1979, that "very little new evidence was presented by either side." Slip op. at 1. This failure was appellees', not appellant's, for it was appellees' burden to prove damages.

■ When a defendant is faced with an excessive demand, so that it would be unfair to expect him to settle, the court will not penalize him by requiring him to pay damages for pre-judgment delay. *See, Marrazzo v. Scranton Nehi Bottling Co.,* 438 Pa. 72, 263 A.2d 336 (1970); *Conover v. Bloom,* 269 Pa. 548, 112 A. 752 (1921); *Pierce v. Lehigh Valley Coal Co. (No. 2),* 232 Pa. 170, 81 A. 142 (1911); *Stevenson v. Ebervale Coal Co.,* 203 Pa. 316, 52 A. 201 (1902); *Mead v. Central Pennsylvania Traction Co.,* 54 Pa.Super. 400 (1913) *later app. Mead v. Central Pennsylvania Traction Co.,* 66 Pa.Super. 343 (1917). Here, not only do the chancellor's opinions indicate that appellees' demand was excessive, but it was appellees who were responsible for a considerable part of the pretrial delay. *See* fn. 5, *supra.*

We recognize, however, that the chancellor is in a better position to weigh the equities than we are. If on remand, therefore, the chancellor still thinks that pre-judgment interest is warranted, he may award such interest. He must, however, explain his choice of date from which the interest is to run, and his appraisal of the balance of the equities.

On Appeal No. 284: The decree of the lower court is reversed and the case is remanded for further proceedings consistent with this opinion. After additional findings are filed, either party may file exceptions. Any further appeal must be from such final decree as may be entered following the dismissal of those exceptions.

On Appeal No. 353: The appeal is dismissed as rendered moot by the foregoing order.