### G. W. WHITEHURST v. NORFOLK SOUTHERN RAILROAD COMPANY.

(Filed 20 September, 1911.)

1. Navigable Waters—Drawbridges—Construction—State's Powers —Nuisance.

   Subject to the supervisory power of the National Government, a State may authorize the construction of a drawbridge over navigable bodies of water within its borders, and no cause of action arises against a railroad for an illegal obstruction in such waters by reason of thus erecting a bridge for public purposes and benefit, leaving reasonable spaces for the passage of vessels, for structures of this character are lawful and not nuisances.

2. Navigable Waters — Drawbridges — Construction — Damages to Vessels—Negligence—Accident—Evidence.

   Defendant was erecting a bridge for railroad purposes across the navigable waters of Albemarle Sound, under authority duly conferred by the State. There were two draws therein, a large one near the northern shore and a smaller one, 70 feet long, near the southern shore. The plaintiff was "tacking" his sailing vessel against the wind, in the daytime, for the purpose of going through the northern draw, when informed that it was not operated or open, and then changed his course for the southern draw. The latter was open about 35 feet on one side and the other side was obstructed by a large pile driver, used in the con-

struction of the bridge. Seeing the obstruction, the skipper attempted to tack and stand away from the bridge so as to lay his course through the open space, but his vessel for some unexplained reason failed to "go about," fell off before the wind, and the sails filled in a strong breeze, which caused the vessel to be wrecked on a shoal: *Held*, upon this evidence, the proximate cause of the loss was an accident, the failure of the vessel to respond, and the defendant was not liable for the damages sustained.

APPEAL from *Justice, J.,* at January Term, 1911, of PASQUO-TANK.

These issues were submitted:

First. Was plaintiff's boat and cargo damaged by the negligence of defendant railway company, as alleged? Answer: "Yes."

Second. What damage, if any, has plaintiff sustained? Answer: "Boat and cargo, $1,500."

In apt time defendants moved to nonsuit, which motion was denied and defendants excepted. From the judgment rendered the defendants appealed.

*E. F. Aydlett and J. C. B. Ehringhaus for plaintiff.*
*W. M. Bond for defendants.*

BROWN, J. On 22 December, 1909, the defendant company by its contractors, the construction company, was constructing a railway bridge about 6 miles long from Mackey's Ferry, across Albemarle Sound to its northern shore near Edenton. The bridge was not entirely completed nor in use by the railroad company. In the northern part of this bridge is located a large drawbridge, over deep water intended for passage of vessels. This was about completed, but could not be opened on day named because the cement had not had time to set.

There is also another pivot drawbridge in southern portion of the bridge about 1½ miles from the southern shore. This drawbridge is over 70 feet long. It turns upon a central pillar and leaves 35 feet clear space open on each side of the pillar for passage of vessels. On date named the pivot draw was opened, that is, extended east and west, the main bridge run-

ning north and south. The 35-foot space on northern side of the pivotal pillar was obstructed by a pile driver at work on the bridge abutment. The other side of the draw was clear and open for passage of vessels. There was nothing to prevent a vessel passing through it, wind and weather permitting.

The evidence of the plaintiff shows that on date named he was beating (tacking) his schooner *Alva* up Albemarle Sound bound for Avoca loaded with 2,000 bushels of oyster shell. The wind was blowing from west northwest, being almost dead ahead for Avoca, which is some miles west of the bridge.

The plaintiff was tacking back and forth, making for the large northern draw at 9 A. M., when he was told by the skipper of the *Waterboy* that the northern draw was closed. Plaintiff at once steered south for the southern draw. When he was opposite it he saw that the northern side was blocked by a pile driver at work. He attempted to tack and stand away from the bridge so as to lay his course and go through the open space on southern side of the long drawbridge. When he put his helm down to tack, the *Alva* "missed stays," that is, failed to "go about" and put her bow into the wind; instead, she fell off before the wind, and her sails filling in a strong breeze caused her to be wrecked on a shoal.

The *Alva* was 25 years old and the plaintiff, her owner and captain, 62, with 40 years experience on the waters of Albemarle Sound.

It is admitted the bridge in question was constructed under the authority of the General Assembly of this State and under the supervisory powers conferred on the Government of the United States in such cases by act of Congress.

The right of the State, subject to the power of the National Government, to authorize such structures across navigable bodies of water within its borders is too well settled to be now discussed. *Pedrick v. R. R.,* 143 N. C., 486, and cases cited; *Works v. R. R.,* Fed. Cases, No. 18046.

It is settled beyond controversy that where a bridge over a navigable stream is erected by authority of law for public purposes and benefit, and leaves reasonable spaces for the

passage of vessels, it is not a nuisance, but a lawful structure. *Pedrick v. R. R., supra.* For the convenience and safety of navigation, it is well known that the plans and specifications of such structures as this and its drawbridges must be approved by the proper Federal officials.

It is manifest that plaintiff has no cause of action arising out of an illegal obstruction of Albemarle Sound by the erection of this bridge across it.

Nor are we able to perceive that the defendant was guilty of negligence and wanting in the discharge of any duty it owed the plaintiff, while constructing this bridge. Its "draws" had not been completed and could not be used with the facility for passing vessels that they now afford. It is manifest that in constructing these draws navigation must necessarily be much more inconvenienced and impeded than when they are in a completed state and properly operated. Such temporary inconvenience must be suffered for the public weal.

It is manifest from plaintiff's evidence that the proximate cause of his loss was an accident which neither he nor any one else could foresee or prevent. The plaintiff was beating to windward against a strong north nor'westerly wind, heading for the northern draw. Before he reached it he was informed from the *Waterboy* that it was closed. The plaintiff doubtless "eased off his sheets" and pointed towards the southern draw. It was no trouble for him to "stand away" from the bridge as far off as he pleased, for the bridge was to his windward and the wind was blowing him away from it. Plaintiff says he was given no notice or signal that the northern side of the southern draw was blocked by a pile driver. It was 9 o'clock in the morning and any reasonable vigilance could have discovered such a lofty object as a pile driver 100 yards away. Plaintiff, however, says he did see the obstruction when he got opposite the draw. At that time he was in open water and in no danger in case his vessel worked all right. He then "tacked ship" with the evident intention of getting in a position and then laying his course through the open draw, but unfortunately the *Alva* failed him at the critical moment. Instead of "coming about"

in obedience to her helm, she fell off, and before he could recover her she grounded on the shoal, which according to the uncontradicted evidence was 250 yards from the bridge and 2,000 feet from the southern draw.

The failure to answer her helm and tack at the critical moment has wrecked sailing craft before the *Alva.* Her misbehavior was plainly the proximate cause of her grounding on the shoal. It is a superstition among sailors that sailing craft have their individual peculiarities and idiosyncrasies and become unmanageable when least expected. Some one, doubtless a crusty and disappointed bachelor, has said that is the reason they are given the feminine gender and called *"She."*

This plaintiff, an experienced sailor, knew his craft and that she was heavily laden and not so active as when light. It may have been the part of wisdom to have dropped anchor and waited for a more favorable breeze rather than attempt to beat through a drawbridge against a strong head wind.

However that may be, we see nothing in the record which justly renders the defendants liable for the loss of plaintiff's vessel.

The motion to nonsuit is sustained and the action dismissed.
Reversed.