## THE MATTIE.

(District Court, E. D. New York. January 19, 1924.)

1. **Towage ☞11(1)—Tug not insurer of tow.**

   Tug is not insurer of tow.

2. **Collision ☞123—Towage ☞15(2)—Libelant seeking damages from collision has burden of proving negligence.**

   Libelant seeking damages, from collision of tow with abutment of bridge, either through negligence of tug or negligence of pile driver,

in violating Act March 3, 1899, § 15 (Comp. St. § 9920), has burden of proving negligence.

3. **Towage ☞11(1)—Captain of tug held negligent, and tug liable for injury to tow.**

   Captain of tug *held* negligent in proceeding with tow into position such that he was compelled to take unnecessary chances with tow in endeavor to extricate himself, rendering tug liable for injury to tow.

4. **Navigable waters ☞23—Pile driver creating danger to vessel using channel may be liable under statute for damages.**

   Under Act March 3, 1899, § 15 (Comp. St. § 9920), declaring it unlawful to tie up or anchor vessels or other craft in navigable channels in manner to prevent or obstruct passage of other vessels or craft, pile driver tied at end of pier near drawbridge, in manner to create dangerous situation for vessels desiring to use draw, may be liable for damages proximately resulting.

5. **Navigable waters ☞23—Pile driver's obstruction of channel held not proximate cause of damage.**

   Where tug captain, after seeing pile driver tied at end of pier so near to draw as to render use of draw unsafe, continued to proceed until he reached such position that he was forced to take unnecessary chances with his tow in effort to extricate himself, *held*, captain's negligence was proximate cause of injury to tow, and pile driver was not liable because of its obstruction of course, notwithstanding Act March 3, 1899, § 15 (Comp. St. § 9920).

In Admiralty. Libel by Cleary Bros., Inc., against the steam tug Mattie, her engines, etc., wherein libelee petitioned in Allen N. Spooner & Son, Inc., owner of pile driver No. 3. Decree for libelant against the tug only.

Affirmed 5 F.(2d) 1001.

John R. McMullen, of New York City, for libelant.

Whittman, Ottinger & Ransom, of New York City, for the Mattie.

Duncan & Mount, of New York City, for pile driver No. 3.

INCH, District Judge. About midday September 21, 1922, the tug Mattie was towing the scow Roslyn up the East River. It was a clear bright day with apparently no wind to speak of or any unusual condition of weather or tide. As one witness said, "It was a fine day."

The scow was loaded with sand and gravel and was being towed behind the Mattie, by means of hawsers. These hawsers were about 40 feet long and ran from the stern of the tug to each corner of the bow of the scow.

The tug and scow was proceeding up the East River and running with the tide, which was just beginning to flood. At Willis ave-

nue, a bridge crosses the river. This bridge has two draws, one on the west or Manhattan side, and one on the east or Bronx side. Between these two draws in the middle of the bridge and dividing the river into two channels is a rugged stone support, and on the east side and west side of these two so-called channels is a similar stone abutment.

The scow in question is owned by the libelant Cleary Bros., Inc.

The East River at this point is a well-known and busy thoroughfare. It seems at certain parts of the tide each day a current sets in some distance below the bridge, and this has a tendency to run towards the Manhattan side until a few blocks below the bridge, where it turns and approaches in a diagonal direction the east or Bronx side.

Whether or not this current was running at the time of the accident is disputed; the libelant claiming that the tide had reached a condition, at least one-half hour before the accident, where its effect would be unnoticeable. However, it seems that when the current is running, tug captains prefer to take the west side or Manhattan draw in going up the river.

Apparently the tug Mattie was so proceeding in the direction of the west draw, but then changed her course and endeavored to pass through the east draw. In doing so the starboard side of the bow of the scow Roslyn drove against the corner of the aforesaid stone abutment on the land or east side of this east draw and was damaged. Both the towing hawsers broke, and the scow and the tug Mattie proceeded to drift through the east draw. The tug later succeeded in again getting hold of her tow, and the latter was beached.

The libelant claims that the scow Roslyn was damaged by reason of the negligence of the tug. The tug claims that it was not negligent and blames the whole accident upon a large pile driver No. 3, which at the time was lying alongside the end of a pier at the foot of 126th street, a little below the west or Manhattan draw.

The owner of this pile driver No. 3, the respondent Allen N. Spooner & Son, Inc., was thereupon duly petitioned in by the tug, and has answered, denying any negligence or liability.

[1] There is no evidence that the scow Roslyn was at fault in any way. The tug was not an insurer.

[2] The sole question therefore is: Was this scow damaged simply in an accident for which no one is liable, or was she damaged by negligence on the part of the tug or the pile driver No. 3, or both? The burden of proof was on libelant to prove negligence.

[3] Taking up the liability, if any, of the tug Mattie, it seems to me plain when all the testimony is considered that her captain was negligent. The time was about noon, a clear fine day, and that there was no unusual disturbance in the water or other conditions in this much traveled channel. The conclusion is irresistible that the captain of the tug carelessly proceeded with his tow into a situation where, in his endeavor to extricate himself, he was compelled to take unnecessary chances with his tow and unfortunately he was not successful in avoiding damage to it.

The testimony of Capt. Parkhill, a disinterested witness, called by the tug, in my opinion, confirms this view. This witness was a licensed captain in charge of a tug boat Golden Age for the Newtown Creek Towing Company, and on the day in question had a coal boat alongside and was proceeding up the East River towards the Willis Avenue Bridge a little behind of, and going in the same direction as, the Mattie with the Roslyn. The mere fact that the Roslyn was being towed behind the Mattie while Capt. Parkhill's tug had her tow alongside is unimportant, for the reason that I refer to this testimony, not to show a method of towing, but that the navigation of the Mattie was blameworthy. This witness says that when he got up about 119th street, which is about 8 or 9 blocks away from the Willis Avenue Bridge, he saw the Mattie and her tow ahead of him; "there is no use of two boats going up around that bridge at the same time, and I slowed down to let him go through the bridge." He then says that he waited, heard the Mattie blow an alarm several times, and that he saw the derrick of the pile driver over certain carfloats that were sticking out into the river which has a slight turn about that point. When Parkhill had proceeded slowly around and up to about 123d street, he says: "I saw him maneuvering around there, and the first thing I saw the Mattie shoot for the Bronx draw. He was slowed down and was blowing his whistle, and I stopped my boat still, and laid there." A little later in his testimony he says: "When I got there (referring to a place where he could see clearly), I saw the pile driver was laying on the end of the dock, and I had to try to make that Manhattan draw myself and blew an alarm to see if I could get him off the end of the dock." "I was headed for the Manhattan draw, yes;

but I saw the pile driver, and I knew I could not make the Manhattan draw and took a chance with the other draw." "When I got up around 125th street, I saw the pile driver laying there, and I knew I could not make that draw, and I got myself in shape for the other draw." "This was about a block and a half or two blocks away from the bridge."

This witness had testified he had seen the derrick of the pile driver about four blocks away, and says that when he got about two blocks, which was about 125th street, he saw the pile driver plainly, and that then, "when I saw the pile driver, I knew I could not make that draw and had my boat alongside and I could shape my course up." He did so and passed safely through the east or Bronx draw. It may be argued that both of these captains took chances, as Parkhill admits he did; but it seems to me that no one can consider all the testimony without coming to the conclusion that the captain of the Mattie neglected to exercise that prudence and caution which an ordinarily prudent captain should exercise, and on the contrary allowed himself to get into this dangerous position because of a reliance entirely upon a blowing of his whistle which should have been shown to him some time before to be a vain thing. It is like an automobile approaching a crossing simply relying on the blowing of the horn. Reasonable care calls for exercise of eyesight as well. The great preponderance of evidence shows that this large and cumbersome pile driver was still and fast to the end of the pier. I believe that any alleged maneuvering was but an excuse of a negligent captain. This was not an error of judgment in extremis. It was neglect. The captain of the Golden Age testified he heard him blowing whistles several blocks away.

It seems to me proved that the captain of the tug, by the exercise of reasonable prudence and care, could have seen that his reliance on whistles alone was a vain and useless thing, and he should have thereupon shaped his course for the Bronx draw.

That the above was apparent to Capt. Parkhill was admitted by him, and it seems to me that it should have been equally apparent, in the exercise of reasonable care, to the captain of the Mattie.

The fault therefore was that the captain of the Mattie carelessly allowed himself to get into a position where he had to take, in view of the state of the tide, not only a chance but a very dangerous chance.

[4] The pile driver No. 3 presents an entirely different question. There was no collision between it and the scow. Lying off the end of a pier, may, of itself, be perfectly safe and proper and entirely protected from attack by reason of any statute which relates to vessels going in or out of the slip. It was not anchored in the channel. The question as to permit was not raised in any way on the trial. Yet it is plain that this pile driver No. 3 by its bulk and position at the end of the pier, and so near the west draw, created a dangerous situation to vessels desiring, at that state of the tide, to use the west draw.

One witness stated in substance that he called to those in charge of the pile driver that it was dangerous, and it appears that the Golden Age and the Mattie both decided that they could not make the west draw; the latter carelessly waiting until the hazard had been greatly increased. The east draw at the state of the tide was apparently not the customary one to take, yet the presence of the pile driver No. 3 compelled vessels to take this draw, although they were entitled to use the west draw.

The fact that the Mattie carelessly came to its decision does not relieve the pile driver No. 3 from blame if it was also in the wrong.

If the master of the pile driver No. 3 had gone around and into the slip instead of tieing up at the end of this pier, where it remained for several hours, the Mattie and the Golden Age would have passed up the west draw. So far as I can see, there was no reason for tieing up there. The master said he had no orders, and that he went ashore to find out what was wanted of him to do.

The claimant cites section 15, Act March 3, 1899 (30 Stat. 1152; U. S. Comp. St. § 9920), which reads, in part: "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft."

The pile driver No. 3 was in or substantially in the channel but a short distance from the west draw. It was tied up; it prevented or at least obstructed the Mattie and her tow from going up the west draw as it did the Golden Age. It compelled the Mattie to take the east draw.

Cases under this statute relate largely to collisions with other vessels, and anchoring in channels. Other statutes relating to the use of a pier do not apply. However, this statute, forbidding the tieing up of vessel in navigable channels in such a way as to obstruct the passage of other vessels, seems to me to impose a duty, for violation of which

the offending vessel must respond in damages, if found to have been a cause of damage. Was this neglect of a duty one of the causes of the damage here?

[5] Had the Mattie attempted to go up the west draw and she and her tow collided with the pile driver No. 3, or been damaged against abutments of the west draw, not only would the statute apply, but the breach of duty imposed by it might have been one of the proximate causes of the damage. The Mattie did not do this, however, but decided, too late, to go up the east draw. I cannot find that this east draw was so inherently or plainly dangerous as to be likely to cause damage to any tug and tow going through it. I cannot speculate or guess about it. So far as I can see, if the Mattie had carefully shaped her course for the east draw when it plainly appeared that the pile driver was tied up, she could have made the east draw safely. If this is so, then the violation of the statute was not one of the proximate causes of the damage. There is therefore no liability on the part of the pile driver No. 3, and the petition against it must be dismissed.

Decree for libelant against the tug.