**MAIER v. PUBLICKER COMMERCIAL
ALCOHOL CO.**

No. 81 of 1944.

District Court, E. D. Pennsylvania.

Aug. 31, 1945.

As Amended Oct. 18, 1945.

Otto Kraus, Jr., and Howard M. Long, both of Philadelphia, Pa., for libelant.

John B. Shaw, of Krusen, Evans & Shaw, all of Philadelphia, Pa., for respondent.

BARD, District Judge.

This is a libel in personam to recover the cost of removing from libellant's vessel, partially submerged in the navigable waters of the Delaware River and from the channel at the foot of Packer Avenue, a large amount of industrial waste discharged by respondent's alcohol plant into these navigable waters.

 Jurisdiction is conferred upon this Court by Section 24(3) of the Judicial Code.[1]

I make the following special

### Findings of Fact:

1. Libellant, B. J. Maier, a Pennsylvania citizen trading as Great Eastern Metal Company, has engaged in the business of salvaging and scrapping ships for twenty-five years.

2. Respondent, Publicker Commercial Alcohol Company, is a corporation engaged, at all times pertinent hereto, in the manufacture of alcohol and allied commercial products. Respondent's plant is located on the shore of the Delaware River at Delaware Avenue and Bigler Street, Philadelphia, Pennsylvania.

3. On May 27, 1940, libellant purchased a vessel formerly known as the "Oglethorpe," together with another vessel, from the Philadelphia Derrick and Salvage Corporation.

4. On that date, and subsequently thereto, these vessels were lying in a sunken and partly submerged condition in the navigable waters of the Delaware River, in a slip at the foot of Packer Avenue, Philadelphia, beside a wharf belonging to the City of Philadelphia.

5. The partially submerged vessel, formerly known as the "Oglethorpe," which is the subject matter of this libel, was 277 feet in length, about 50 feet wide and about 30 feet deep. At the time libellant became her owner the vessel had a hole approximately 100 feet in length and from 1 to 6 feet in width in her starboard side, and a hole 15 feet in length and about 7 feet in width in her port side.

6. On September 1, 1942, libellant entered into a contract with Metals Reserve Company, a government agency, to raise and scrap the vessels and to sell the metal obtained therefrom to the Metals Reserve Company. The contract was to be performed within eight months, but the time of performance was later extended to October 15, 1944.

7. During the Fall of 1942, shortly after executing the agreement with the Metals Reserve Company, libellant raised one of the vessels during a two week period at a cost of $1200.

8. During September or October 1942 libellant did the preliminary work of patching the starboard hole on the other vessel but abandoned further efforts to raise the vessel due to the approaching Winter season.

9. In January 1942, pursuant to a directive of the Office of Production Management, respondent substituted grain for molasses as the basic material for alcohol production. Respondent was unable to obtain screening and drying equipment to process the grain residue and therefore proceeded to discharge this residue into the Delaware River.

10. Between January 1, 1943, and July 31, 1943 respondent discharged 9,190 tons of non-soluble residue and 21,859 tons of soluble residue in solution or suspension into an open sewer of the City of Phila-

[1] Rev.Stat. § 563(8) (9), § 629(6), as last amended by Act of June 10, 1922, c. 216, § 1, 42 Stat. 634, 28 U.S.C.A. § 41(3).

delphia emptying into the Delaware River about 250 feet above the partially submerged vessel.

11. Respondent did not receive authorization or consent to discharge the residue from the United States of America, the Commonwealth of Pennsylvania, or the City of Philadelphia.

12. The grain residue filled the holds of the submerged vessel. Between June 18, 1943, and October 8, 1943, libellant expended time, labor, equipment and materials to remove the grain residue so that the vessel could be raised.

13. The grain residue also filled the channel on the river side of the vessel extending two feet above water level at low tide. Libellant was required to hire tug boats to churn up the channel so that the vessel could be removed from the slip when floated.

14. The cost of removing the mash, raising the vessel, and removing her from the slip was $15,400.

15. Respondent acted in good faith and discharged the grain residue into the Delaware River only because it was unable to obtain adequate screening and drying equipment to process the mash.

## Discussion

Pursuant to a directive of the Office of Production Management, respondent converted from molasses to grain for the production of commercial alcohol about January 1, 1943. Respondent was unable to obtain adequate screening and drying equipment to process the large quantity of grain residue which was a by-product of the grain alcohol. It was therefore necessary to discharge many tons of this substance into the Delaware River between January 1, 1943, and July 1, 1943. The grain residue filled the channel of a slip at the foot of Packer Avenue, Philadelphia, and filled the holds of libellant's partially submerged vessel lying in the slip.

Libellant seeks recovery of the additional and extraordinary expenses incurred, because of the grain residue, in raising and removing the submerged vessel.

Respondent's defense is in three parts: (1) That the discharge of grain residue was a result of the conversion directive of the War Production Board and was in furtherance of the war effort, relieving re-

spondent of liability; (2) that libellant was at fault in leaving a submerged vessel in the slip at Packer Avenue in violation of the Rivers and Harbors Appropriation Act of 1899,[2] and that this fault was the sole or a contributing cause of the damage; (3) that libellant did not sustain his burden in proving damages and that the damages claimed are speculative.

The pleadings and the evidence adduced at trial raise two questions for decision: (1) Whether the discharge of large quantities of grain residue was such negligence or private nuisance which would enable libellant to recover damages; and (2) whether libellant has satisfactorily met the burden of proof on damages.

### Liability of Respondent

Libellant contends that the discharge of the grain refuse was in violation of Section 13 of the Rivers and Harbors Appropriation Act of 1899[3] and therefore negligent. Section 13 of the Act prohibits, inter alia, the discharge of solid refuse by a manufacturing establishment or mill into any navigable water of the United States unless authorized and permitted by the Secretary of War under penalty of criminal prosecution. Mere violation of this criminal statute does not, of itself, constitute actionable negligence, American Barge Line Co. v. Stoll Oil Refining Co., D.C.W.D. Ky., 22 F.Supp. 894; Brush et ux. v. Lehigh Valley Coal Co., 290 Pa. 322, 138 A. 860. To recover on the theory of negligence it was incumbent upon libellant to show that, in discharging the grain residue into the river, respondent failed to observe that degree of care, precaution and vigilance which the circumstances justly demanded and because of such failure libellant was injured. Baltimore & P. R. Co. v. Jones, 95 U.S. 439, 24 L.Ed. 506; Philadelphia, W. & B. R. Co. v. Stinger, 78 Pa. 219. This libellant failed to establish. On the contrary, the evidence shows that respondent exerted every effort to obtain equipment to process the mash, that it discharged the residue into the river only when alternative efforts failed, and that it ceased to discharge the grain refuse when processing equipment was made available.

Libellant may recover damages, however, on the theory that respondent's acts constituted an actionable private nui-

2 Act of March 3, 1899, c. 425, § 15, 30 Stat. 1152, 33 U.S.C.A. § 409.

3 Act of March 3, 1899, c. 425, § 13, 30 Stat. 1152, 33 U.S.C.A. § 407.

sance. Keiser v. Mahanoy City Gas Co., 143 Pa. 276, 22 A. 759; Keppel v. Lehigh Coal & Navigation Co., 200 Pa. 649, 50 A. 302; Sussex Land & Live Stock Co. v. Midwest Refining Co., 8 Cir., 294 F. 597, 34 A.L.R. 249; Peck v. City of Michigan City, 149 Ind. 670, 49 N.E. 800. A nuisance may be defined as the unreasonable, unwarrantable, or unlawful use by a person of his own property which causes injury, damage, hurt, inconvenience, annoyance or discomfort to one in the legitimate enjoyment of his reasonable rights of person or property. District of Columbia v. Totten, 55 App.D.C. 312, 5 F.2d 374, 40 A.L.R. 1461, certiorari denied 269 U.S. 562, 46 S.Ct. 21, 70 L.Ed. 412; Kramer, Adm'r v. Pittsburgh Coal Co., 341 Pa. 379, 19 A.2d 362. Although one may use his property in lawful pursuits as he pleases, he must observe the rights of his neighbors, Brennan Const. Co. v. Cumberland, 29 App.D.C. 554, 15 L.R.A., N.S. 535, 10 Ann.Cas. 865, and where this duty is violated the guilty party may subject himself to an action for damages or to the restraining arm of the courts. Hauck v. Tidewater Pipe Line Co., Ltd., 153 Pa. 366, 26 A. 644, 20 L.R.A. 642, 34 Am.St. Rep. 710.

■ Respondent had a lawful right to manufacture alcohol from grain. It had a complementary duty to conduct this process in a manner which would not injure others. That the injury to libellant was foreseeable and preventable is implicit in the fact respondent used equipment, albeit inadequate, to prevent it and in the fact that respondent attempted to obtain additional units of this equipment. Since the injury was foreseeable and preventable, it was, in law, intentional. And an intentional injury caused by the maintenance of a private nuisance is actionable. E. Rauh & Sons Fertilizer Co. v. Shreffler, 6 Cir., 139 F.2d 38.

In choosing to manufacture alcohol from grain, in compliance with the Office of Production Management directive and in furtherance of wartime necessities, without waiting for the acquisition of adequate screening and drying equipment, Publicker chose to dump great quantities of grain residue into the river. This operation imposed a substantial extraordinary expense upon libellant. For this course of conduct Publicker must respond in damages.

■ Respondent contends it should be relieved of liability because the Office of Production Management issued a directive to respondent to convert to the use of grain. It also contends it had an authorization from the War Department to dump the grain residue into the river. These contentions are without merit. The Court sustained objections to most of the evidence pertaining thereto. Authorization from the War Department to discharge the grain residue into the river, if permission was in fact granted, might be a valid defense to a criminal prosecution brought under Section 13 of the Act of March 3, 1899. Such authorization, however, would not carry with it the right to create a private nuisance. Baltimore & P. R. Co. v. Fifth Baptist Church, 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739; Peck v. City of Michigan City, supra. Likewise, the mere fact that respondent acted pursuant to the Office of Production Management directive does not relieve it of liability. Publicker presumably received adequate consideration for all the grain alcohol it sold and, in turn, it must give adequate compensation for those injuries it inflicted in the course of manufacturing the alcohol.

■ As an additional defense respondent argues that libellant violated Section 15 of the Rivers and Harbors Appropriation Act of 1899 and thus contributed in whole or part to the damages incurred. Section 15 of the Act prohibits, inter alia, the obstruction of navigable waters by sunken vessels and requires adequate marking and prompt removal of submerged vessels under penalty of criminal prosecution. Even though it may be conceded that libellant violated the statute, the violation was merely a condition precedent to but not the cause of the injury so that libellant is relieved of any fault. The No. 1, 2 Cir., 180 F. 969; Hutchinson v. Follmer Trucking Co., 333 Pa. 424, 5 A.2d 182.

### Proof of Damages

■ Libellant is entitled to recover the extra expense to which he has been put by respondent's conduct. The applicable measure of damages is the difference between what it actually cost to raise and move the vessel after the grain refuse was deposited in and around the ship and what it would have cost to raise the vessel if Publicker had not dumped the mash into the river. Elder v. Lykens Valley Coal Co., 157 Pa. 490, 27 A. 545, 37 Am.St.Rep. 742; Keppel v. Lehigh Coal & Navigation Co., supra; Stevenson v. Ebervale Coal Co., 203 Pa. 316, 52 A. 201; Pennsylvania R. Co. v. City of Pittsburgh, 335 Pa. 449, 6 A.2d 907;

Hoffman v. Mill Creek Coal Co., 16 Pa. Super. 631.

The major portion of libellant's evidence was devoted to proof of damages. Much of this evidence is vague, conflicting and contradictory and for this reason respondent urges that libellant claims speculative damages and has failed to meet the burden of proof. Lentz v. Choteau, 42 Pa. 435. For these reasons I find it necessary to discuss the proof of damages in detail.

Libellant offered in evidence four bills for gasoline totalling $251.20, a bill for lumber in the amount of $300.02, and a bill for rent of an air compressor in the amount of $199. Libellant testified that the materials and the compressor were used in raising the submerged vessel. Respondent raised no objection to these items.

Libellant offered in evidence a statement from P. F. Martin, Inc., for the services of tugs, totalling $1175. Libellant testified that this expense was incurred for churning the mash in the Packer Avenue slip so that a channel could be cleared for removal of the ship. However, Maier testified that the "whole period of operation" was June 18, 1943, to October 8, 1943, and respondent argues that the charges for tug hire on October 14, 18 and 21, totalling $750, cannot be considered in this case as being outside the period of operation. Libellant's foreman testified that men were employed for approximately six weeks removing the mash and silt from the bilges after the vessel was raised and moved from the Packer Avenue slip to Pier 112. Libellant testified that salaries were paid for this work as evidenced by his cancelled checks dated from October 15, 1943, to November 26, 1943. It seems to me that when libellant said "the whole period of operation" he was referring to the operation of raising the vessel, and that, in fact, libellant was removing the mash until late in November at Pier 112. In objecting to the last three charges for tug hire, respondent assumes that there was no further work relating to the grain refuse after October 8th and that the vessel was moved from the slip on that date. But there is no direct testimony in support of these assumptions. Certainly the men were clearing the refuse from the bilges for some six weeks after October 8th and the vessel may not have been moved to Pier 112 until some time after it was raised. I do not find the charges for tug hire on October 4, 18 and 21 inconsistent with the evidence as a whole and I will therefore allow them as part of the expenses incurred by libellant.

Libellant used one three-inch pump, two six-inch pumps and one eight-inch pump and one six-inch airlift which he owned between June 18 and October 8th to pump the refuse and water out of the holds. He also used one ten-inch pump and two or three six-inch pumps which he borrowed without charge from the Philadelphia Derrick and Salvage Corporation and for the use of which he makes no claim. During the same period libellant used his 25-ton floating derrick to move the pumps and to operate a clam shell bucket for removing the refuse. Maier testified the rental value of pumps as established by the Office of Price Administration to be $50 per month for a three-inch pump, $125 per month for a six-inch pump, and $195 per month for an eight-inch pump. Maier stated that the rental value of the 25-ton floating derrick was $90 per day and that he had leased the derrick on other occasions for that price or more. Respondent introduced no evidence to refute these figures and I will accept them as reasonable. Libellant may include the use (rental) value of his machinery utilized to raise the ship as part of the expense of the operation. Sedgwick on Damages, Vol. 1, Sec. 171(b). The pumps were used for approximately three and a half months, and rental value of the four pumps for that period will be included in computing the expense. Libellant introduced no evidence to establish the use value of the airlift pump and, in the absence of such proof, this item cannot be included. Libellant was unable to establish the exact number of days during which the floating derrick was employed. He testified that the derrick was definitely used five days each week during the sixteen week period, and that it was used on some of the Saturdays and Sundays. Libellant failed to prove the 110 days of use which he claims, but I will allow rental value of $90 per day for the eighty days of use definitely established.

Maier claims $100 per week for fifteen weeks as the reasonable value of his services for supervising the salvage work. He has twenty-five years experience in raising sunken vessels. He supervised the difficult operation in its entirety and was on the job from eight to twelve hours each day including some Saturdays and Sundays. This claim appears to reflect the reasonable worth of his services and will be allowed.

■ Libellant claims $500 for diver's wages. Maier stated that the diver received $25 per day and his tender received $12.50 per day; that he was uncertain as to the exact number of days the diver was employed but that it was a little more than a week. It is impossible to determine from Maier's testimony how many days the diver worked. Any approximation would be nothing more than a guess. This claim, therefore, cannot be allowed.

As the last item of expense libellant claims $2310 for wages paid to his employees between June 18th and October 8th, during which period the vessel was raised, and $940 as wages for employees who removed the silt and grain residue from the bilges between October 8th and November 26th. Maier stated the amount of the weekly expenditure for labor from a present recollection after refreshing his memory from checks marked "salary and petty cash" dated at weekly intervals. Although counsel for respondent demanded production of the social security records which Maier admittedly kept, libellant was unable to produce these records or any other business records of wages paid.

■ Respondent contends that, under the "best evidence" rule, Maier's testimony should have been excluded upon objection and that the Court should not now consider this evidence in assessing damages. Counsel labors under a misconception of the rule. The "best evidence" rule is one of preferential evidence requiring that where a party seeks to prove a writing for the purpose of establishing its terms, production must be made of the writing itself unless the non-feasibility of production is satisfactorily established.[4] Since libellant does not seek to establish the contents of the social security or other business records, the rule has no application here. Maier is competent to testify as to the wages paid so long as the facts are within his own knowledge. It may be true that libellant's business entries might be entitled to greater probative force than his oral testimony, but the business records are not preferred over oral testimony nor is libellant required to produce them.[5]

The weekly wages paid between June 18th and November 26th will be included as part of the expenses with one exception.

The wages paid on June 18th amounting to $155 were for labor performed before the salvaging operations began and must therefore be excluded.

Libellant has thus established by competent testimony that the cost of 'raising and moving the submerged vessel from the Packer Avenue slip, with the holds of the vessel and the slip channel full of grain residue discharged from respondent's plant, was approximately $15,400. Maier stated that it cost $1200 "to move" a submerged vessel of approximately the same size, in a similar condition, and located nearby. That vessel was raised about eight months before this salvage operation began and before respondent began to discharge the grain residue. Libellant urges that he is entitled to a judgment for the difference between the cost of raising that vessel and the amount expended in this salvage operation.

Respondent argues that no judgment can be entered since the facts do not afford reasonable basis for assessing even approximate damages, and that an award of damages must, of necessity, be speculative.

■ It must be conceded that some of libellant's evidence on damages was contradictory and confusing. However, inability to compute the amount of damages with precise mathematical accuracy will not preclude the entry of judgment. Palmer v. Connecticut Railway & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336, rehearing denied, 312 U.S. 713, 61 S.Ct. 609, 85 L.Ed. 1143; Christensen Mach. Co. v. United States, 50 F.2d 282, 73 Ct.Cl. 149; Pierce v. Lehigh Valley Coal Co. (No. 1), 232 Pa. 165, 81 A. 141; Eckman v. Lehigh and Wilkes-Barre Coal Co., 50 Pa.Super. 427. If the fact that libellant's damage resulted from respondent's course of conduct is certain, it is sufficient that a basis of computing a reasonable approximation of damages exists. Story Parchment Co. v. Paterson Parchment Paper Company, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. of New York v. Southern Photo Material Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Hartman v. Pittsburgh Incline Plane Company, 159 Pa. 442, 28 A. 145; Hoober v. New Holland Water Co., 43 Pa. Super. 262. To hold otherwise would be perverting justice by a blind quest for perfection.

4 Wigmore on Evidence, 3d Ed., § 1179 et seq.; see also United States v. Haugen, D.C.E.D.Wash., 58 F.Supp. 436.

5 Wigmore on Evidence, 3d Ed., § 1339.

I will accept libellant's proof of the comparative cost of raising and moving the submerged vessel before and after the grain residue was discharged into the river. However, certain deductions will have to be made. The cost of raising the first vessel was comparatively low. Maier was in business for himself, drawing no salary. As individual owner of the business, he bought equipment and paid for help and materials, drawing as his compensation whatever was left in the business. The inference is that, in estimating costs, he habitually failed to value his services and the use of his equipment. I do not believe that Maier included such factors as the value of his services and the value of the use of his equipment in computing the $1200 figure. Adjustment should therefore be made in that regard. In computing the cost of raising and moving the second vessel, I included the wages paid for removing the refuse and silt from the bilges after the vessel was removed to Pier 112. Maier advanced the $1200 figure as the cost of *moving* the first vessel. The inference to be drawn is that he did not include the cost of removing the silt from the bilges which, if the salvaging operations were comparable, was probably removed after that vessel was towed to Pier 112. Finally, it was impossible for any witness to estimate what portion of the solid matter in the ship was river silt and what portion was grain residue, although it is clear that the major part of the matter removed from the vessel was the grain. Respondent cannot be charged with the cost of removing silt. The foreman testified that a considerable amount of silt was found in the first vessel, and it is reasonable to assume that a proportionate amount of silt settled in the second vessel in the period between the raising of the ships. Therefore, the expense of removing the solids from the bilges at Pier 112 and that part of the expenses incurred proportionate to the approximate ratio of silt in the matter removed must be deducted.

■ After making approximate deductions for these factors, I fix libellant's damages at $11,000.

### Conclusions of Law

1. This Court has jurisdiction of this action under Section 24(3) of the Judicial Code, 28 U.S.C.A. § 41(3).

2. This Court has jurisdiction over respondent Publicker Commercial Alcohol Company.

3. The discharge of grain refuse into the Delaware River from respondent's alcohol plant constituted an actionable nuisance.

4. Respondent is liable in damages for the injury caused libellant by the discharge of grain refuse into the Delaware River.

5. Libellant was not at fault in any degree for the damages caused.

6. Judgment may be entered for libellant in the amount of $11,000.